James Heath HAMPTON, a minor By and Through his mother and father and next friends, Vicky Rae HAMPTON and Harry Hampton, Appellants,

v.

Leroy HAMMONS, Appellee.

No. 64649.

Supreme Court of Oklahoma.

July 21, 1987.

Rehearing Denied Oct. 20, 1987.

Chapel, Wilkinson, Riggs, Abney & Henson by Bill V. Wilkinson, and M.D. Bedingfield, Tulsa, for appellants.

Church & Roberts by Donald Church, Tulsa, for appellee.

KAUGER, Justice.

The issues presented concern the sufficiency of evidence to show: (1) negligence *per se* by violation of Tulsa Municipal Ordinance, Title 2, Ch. 1, § 2(d); (2) violation of the state dog-bite statute, Title 4 O.S.1981 § 42.1; (3) common law negligence; and (4) attractive nuisance. We find that: (1) there are material questions of fact necessitating jury resolution on the issues of negligence *per se*, statutory recovery, and common law negligence; (2) that although some evidence was excluded which should have been admitted, the exclusion in and of itself did not amount to reversible error; and (3) that the doctrine of attractive nuisance is inapplicable.

### STATEMENT OF FACTS

This case arises out of an attack by a pit bulldog known as Janie Sue on the appellant, James Hampton (Jamie). Jamie was five and one-half years old at the time of the incident and lived next door to the appellee, Leroy Hammons. The Hampton's and Hammons' backyards adjoined each other and were separated by a wire fence. A portion of the fence was in a state of disrepair and stood only approximately two and one-half feet in height although the rest of the fence was approximately five feet high.

Jamie and his friend, Michelle, were playing in Jamie's backyard when Jamie's puppy jumped the damaged portion of the fence and rolled into the Hammons' yard.

Jamie and Michelle crossed the fence at the same point to rescue the puppy. Having rescued the puppy, Michelle safely crossed back over the fence into Jamie's yard. After several unsuccessful attempts by Jamie to follow his playmate and puppy, Jamie sought another route home. When he tried to pass Janie Sue, she ran around him, entangling his feet in her chain, causing Jamie to fall. The dog then bit him numerous times on the face, arms and torso. Mrs. Hammons rescued Jamie, who by that time was so entangled in the dog's chain, that she had to release Janie Sue in order to do so.

As a result of the attack, Jamie was hospitalized overnight where he had been taken by ambulance. He required many stitches. The bruises, cuts and scratches have healed; but Jamie still requires plastic surgery for removal of scar tissue. It is alleged that he suffers emotional distress because of the attack, and that his distress was amplified through a later encounter with Janie Sue. On that occasion, the dog jumped through a tear in the Hammons' screen door and chased Jamie across the street and into a neighbor's home. Jamie was so disturbed that the neighbor had to carry him home.

On the day Jamie was bitten, the dog had been chained in the Hammons' backyard along with another pit bulldog. Janie Sue was owned by the Hammons' son, Glen Michael, and Tara was owned by their daughter, Elizabeth Kay. Instead of chaining the dogs so that they could run together, Janie Sue and Tara were staked on chains approximately six to seven feet in length which when fully extended allowed the dogs to come within a foot or less of each other. The evidence produced at the trial identified this pattern of chaining as a training technique used to enhance the dogs' natural aggressiveness.

The suit was brought on behalf of Jamie by and through his parents as next friends. At the conclusion of the appellant's evidence, the defense demurred to the evidence. The trial court sustained the demurrer, and the Court of Appeals upheld the ruling, on the ground that no evidence had been presented to show that Jamie's injuries were caused by Mr. Hammons, as the keeper of the dog.

## I

## HARBORING A PIT BULLDOG MAY BE A VIOLATION OF TULSA MUNICIPAL ORDINANCE, TITLE 2, CH. 1, § 2(d)

The determination of whether keeping a pit bulldog within the Tulsa city limits violates that city's municipal ordinance rests upon the construction of three sections of Title 2, Ch. 1: §§ 2(d),[1] (1)(d)[2] and § (1)(b).[3] Section 2(d) defines what constitutes an offense within the meaning of the ordinance and provides:

"It shall be an offense under the terms of this Chapter for any owner within the corporate limits of the City of Tulsa to: ... Harbor, keep or have possession of any vicious animal."

Sections (1)(d) and (1)(b), respectively, set forth the definitions of "owner" and "vicious animal" for purposes of the ordinance. An owner within § (1)(d) is not limited to a person with legal right to pos-

1. Tulsa, Okla.Rev.Ord., Title 2, Ch. 1, § 2(d) (1973) provides:
 "It shall be an offense under the terms of this Chapter for any owner within the corporate limits of the City of Tulsa to: ... (d) Harbor, keep or have possession of any vicious animal...."

2. Tulsa, Okla.Rev.Ord., Title 2, Ch. 1, § (1)(d) (1973) provides:
 "... Owner. 'Owner' as used herein shall mean and include the owner of any dog, cat, animal or domestic animal as herein defined *and also* every other person having the care or custody of or harboring, keeping or main-

taining any dog, cat, animal or domestic animal as herein defined, except a kennel proprietor as herein defined...." (Emphasis supplied)

3. Tulsa, Okla.Rev.Ord., Title 2, Ch. 1 § (1)(b) (1973) provides:
 "... Vicious animal. An animal of vicous propensity is defined as one not only of a disposition to attack every person or animal it may meet but it includes as well a natural fierceness or disposition to mischief, as might occasionally lead it to attack human beings, or animals, without provocation...."

session but also includes anyone who cares for, has custody of, keeps or maintains any dog, cat or domestic animal.[4] The definition of a vicious animal is found in § (1)(b) and, like the definition of an owner, is broad, encompassing more than vicious propensities attributable to a specific animal including breeds of animals known to be naturally fierce or to attack either humans or animals without provocation.[5]

Tulsa is not the only municipality which is so troubled with the vicious characteristics of certain animals that ordinances have been passed banning or severely restricting their freedom. Some jurisdictions have become so concerned, particularly with the pit bulldog, that restrictive ordinances have been enacted specifically aimed at the breed.[6] Other jurisdictions have dealt with the problem, as has Tulsa, by expanding the definition of "vicious animal" to include animals with natural dispositions leading to unprovoked attacks.[7]

■ Because at least one expert witness testified as to the vicious propensities of the pit bulldog breed in general, we do not find that the exclusion or admission of any piece of evidence or combination thereof was sufficient to constitute a miscarriage of justice.[8] Because we have determined that there are important issues of fact requiring jury resolution under both the statutory and common law theories of recovery, a new trial is necessary. There are issues relating to both the Tulsa ordinance and the theory of common law negligence

on which evidence of vicious characteristics of the breed of pit bulls in general has bearing; therefore, evidence relating to the nature of pit bulldogs as a breed is properly admissible.

We find that Title 2, § 2(d) of the Tulsa ordinance was intended to ban animals with vicious propensities from the Tulsa city limits, and that pit bulldogs as a breed arguably possess those propensities. Therefore, we conclude that harboring of pit bulldogs within the Tulsa city limits may violate the Tulsa ordinance.

## II

### SUFFICIENT EVIDENCE WAS PRODUCED AT TRIAL TO RAISE A JURY QUESTION AS TO PROXIMATE CAUSE

■ Having determined that keeping a pit bulldog within Tulsa city limits may violate § 2(d),[9] we must necessarily determine whether the violation amounted to negligence *per se*. It is undisputed in Oklahoma that violation of a municipal ordinance constitutes negligence *per se* if the other elements of actionable negligence are present.[10] When a city ordinance is violated, the elements of actionable negligence are: (1) the injury must have been caused by the violation; (2) the injury must be of a type intended to be prevented by the ordinance; and (3) the injured party must be one of the class meant to be protected by the ordinance.[11]

**4.** Tulsa, Okla.Rev.Ord., Title 2, Ch. 1, § (1)(d) (1973), see note 2, supra.

**5.** Tulsa, Okla.Rev.Ord., Title 2, Ch. 1 § (1)(b) (1973), see note 3, supra.

**6.** See, Eufaula, Oklahoma Ord. No. 87–7–1 (1987); Brownard County, Florida Ord. No. 8550 (1985); Cambridge, Ohio Ord. No. 1904 (1984); Cincinnati, Ohio Municipal Code, § 701–25 (1984).

**7.** *Farrior v. Payton,* 57 Hawaii 620, 562 P.2d 779, 785 (1977); *DuBois v. Myers,* 684 P.2d 940, 942 (Colo.App.Ct.1984).

**8.** *Samara v. State,* 398 P.2d 89, 91 (Okla.1964); See also, 12 O.S.1981 § 78 providing:
"The court, in every stage of action, must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect."

**9.** Tulsa, Okla.Rev.Ord., Title 2, Ch. 1, § 2(d) (1973), see note 1, supra.

**10.** *Eddy v. Oklahoma Hotel,* 228 F.2d 106, 108 (10th Cir.1955); *Boyles v. Oklahoma Natural Gas Co.,* 619 P.2d 613, 618 (Okla.1980); *Foster v. Harding,* 426 P.2d 355, 358 (Okla.1967); *Tulsa Fruit Co. v. Lucas,* 208 Okl. 166, 254 P.2d 788, 792 (1953); *Harbour-Longmire Bldg. Co. v. Carson,* 201 Okl. 580, 208 P.2d 173, 175 (1949).

**11.** *Boyles v. Oklahoma Natural Gas Co.,* see note 15, supra.

It is undisputed that the dog, Janie Sue, was kept in the backyard of the owner's father, Leroy Hammons, from the time the dog was purchased by Glen Michael Hammons until some months after the dog bite incident. Here lies the alleged violation of the ordinance. Having found a possible violation, it is necessary to determine whether the three elements of actionable negligence outlined are also present. Undoubtedly, elements two and three are satisfied. Jamie's mauling is precisely the type of injury intended to be prevented by the ordinance; and Jamie, a child of five and one-half years, most certainly fell within the class the ordinance was passed to protect. The first element, however, requires a determination that the alleged violation caused the injury.

 The question of proximate cause is one of law for the trial court only if no evidence has been produced from which a jury could reasonably find a causal link between the negligent act and the injury or where the facts are undisputed.[12] Otherwise, the proximate or contributing cause of a plaintiff's injury is a question of fact for the jury.[13]

The disputed issues for which there was sufficient evidence produced at trial to raise questions of fact on the issue of proximate cause for the jury included: (1) the state of disrepair of the fence separating the Hampton's and Hammons' backyards; (2) ownership of the fence; (3) whether the manner in which the dog, Janie Sue, was chained did in fact keep her agitated and excited; (4) Mr. Hammons' knowledge of Jamie's frequent trips over the fence to retrieve toys; and (5) whether Mr. Hammons impliedly consented to Jamie's presence on his property. All of these factors bear upon the first element of actionable negligence, proximate cause. There was sufficient evidence produced at trial from which a jury of reasonable persons could have concluded that but for Mr. Hammons' harboring of a vicious dog, Jamie would not have been injured when he crossed the fence to rescue his puppy.

In ruling upon a defendant's demurrer to the plaintiff's evidence, both the trial court and the reviewing tribunal consider every fact favorable to the party against whom the demurrer is directed along with any reasonable inferences which may be drawn therefrom. All conflicting evidence favorable to the defendant is disregarded.[14] A demurrer to the plaintiff's evidence should be sustained only when there is an entire absence of proof to show any right of recovery.[15] Following these precepts, we find that the trial court's ruling sustaining the appellee's demurrer to the evidence on the issue of negligence *per se* was error.

## III

### TITLE 4 O.S.1981 § 42.1 WHEN CONSTRUED WITH TULSA MUNICIPAL ORDINANCE, TITLE 2, CH. 1, § 1(d) INCLUDES AS AN OWNER ANYONE HARBORING OR MAINTAINING A DOG

 The appellee contends that 4 O.S. 1981 § 42.1 [16] and *Hood v. Hagler,* 606 P.2d 548, 550–51 (Okla.1986), construing a similarly-worded statute are dispositive of the

12. *Thompson v. Presbyterian Hosp., Inc.,* 652 P.2d 260, 263 (Okla.1982); *Woodward v. Kinchen,* 446 P.2d 375, 378 (Okla.1968); *Pepsi-Cola Bottling Co. of Tulsa, Okla. v. Van Brady,* 386 P.2d 993, 996 (Okla.1964).

13. *Thompson v. Presbyterian Hosp., Inc.,* see note 17, supra; *Kimery v. Public Service Co. of Oklahoma,* 622 P.2d 1066, 1070 (Okla.1981); *Harbour-Longmire Bldg. Co. v. Carson,* see note 15, supra. See also, *Riss and Co. v. Reed,* 301 P.2d 208, 210 (Okla.1956), where this Court states that the question of proximate cause is always for the jury to determine.

14. *Thompson v. Presbyterian Hosp., Inc.,* see note 17, supra at 262–63; *Boyles v. Oklahoma Natural Gas Co.,* see note 15, supra at 616.

15. *Boyles v. Oklahoma Natural Gas Co.,* see note 15, supra; *Martin v. Stratton,* 515 P.2d 1366, 1368 (Okla.1973); *Tidewater Associated Oil Co. v. Slusser,* 307 P.2d 827, 828 (1957).

16. Title 4 O.S.1981 § 42.1 provides:
"The owner or owners of any dog shall be liable for damages to the full amount of any damages sustained when his dog, without provocation, bites or injures any person while such person is in or on a place where he has a rightful place to be."

issue of liability. We agree that the four elements which must be proven under § 42.1 are: (1) ownership; (2) lack of provocation; (3) injury to the plaintiff by the accused dog; and (4) lawful presence of the plaintiff on the defendant's premises at the time of the attack.[17] Mr. Hammons does not deny that Jamie was bitten by Janie Sue. However, he asserts that no proof was presented at trial of his ownership of the culprit dog, that Jamie was a trespasser not lawfully on his property, and that the dog, Janie Sue, was in fact provoked.

### A.

■ The issue of lack of provocation, is the most easily disposed of. In *Hood,* the only eye witness to the attack was the victim who testified that she had done nothing to provoke the attacking dog. Countering this testimony was the opinion of one of the owners of the two dogs that in his opinion neither animal would attack without provocation. This Court held the conflicting evidence sufficient to create a jury question on provocation.[18]

The facts in *Hood* are analogous; here, as in *Hood,* there was no witness to the attack other than the victim. Jamie testified that he was running in the direction of the dog when the dog ran around him, entangling his foot in the dog's chain, causing him to fall; but that he had done nothing to tease or provoke the dog. Two non-witnesses to the attack, Mr. Hammons and Mr. Garcia, testified that in their opinions Janie Sue would have attacked only if provoked. Here, as in *Hood,* there was

sufficient evidence to submit the issue of provocation to the jury.

### B.

■ We now turn to the more difficult issue of whether Jamie was lawfully on the Hammons' property. Section 42.2 [19] of Title 4 contains the definition of "lawful presence on an owner's property" for purposes of the Act. Under the section, a person is lawfully on private property of the owner of a dog when that person has permission, *express or implied,* of the owner or lessor of the property.

Jamie testified that it was common practice for him and other playmates to climb over the damaged fence separating the two properties to retrieve balls and other toys deposited there in play. Although denying that he knew of the childrens' ingress and egress over the fence, Mr. Hammons did acknowledge that he occasionally saw toys in his backyard which he knew did not belong to his children. Glen Michael Hammons testified that he had seen children going in and out of their backyard and had warned Jamie's older brother, but never Jamie, to discontinue the practice. Both Mr. Hammons and his son testified that there were windows in their home which faced the backyard and that these windows were commonly open in good weather. In fact, it was through these windows that Michael had spotted Jamie's brother when he had given him the warning.

Much was made by the appellee that Jamie's mother had warned him not to climb over the fence the day before the attack. However, Mr. Hammons was nei-

---

17. See, 4 O.S.1981 § 42.1, note 21, supra and *Hood v. Hagler,* 606 P.2d 548, 550–51 (Okla. 1986).

18. *Hood v. Hagler,* see note 22, supra.

19. Title 4 O.S.1981 § 42.2 provides:
 "For the purpose of this act *a person shall be considered to be lawfully upon the private property of the owner of a dog when he is on such property* in the performance of any duty imposed upon him by the laws of this state, or by the laws of the United States, or the postal regulations of the United States, or when reading meters, or making repairs to any public utility or service located on said premises, or when working on said property at the request of the owner or any tenant having a lease upon any portion of said property, or when on such property *upon the invitation, either expressed or implied of the owner* or lessee *of such property.* The term 'public place' shall be for the purpose of this act, mean and include any and all public buildings, parks, playgrounds and recreational facilities, and any and all places of business, amusement or entertainment which are privately owned, wherein merchandise, property, services, entertainment or facilities are offered for sale, hire, lease, or use." (Emphasis supplied)

ther aware of the warning prior to the attack nor did he request that the warning be given in his behalf. These facts, like those on the issue of provocation, were sufficient to create a jury question concerning whether Jamie had Mr. Hammons' implied permission within the meaning of 4 O.S.1981 § 42.2 to cross the fence the day he was bitten. In construing § 42.2, we have previously held that those lawfully on the premises of a dog owner include more than licensees and invitees.[20] Moreover, children under seven years of age are presumed to be incapable of more than a technical trespass.[21] A jury may find under these facts that Jamie fell within the protected category.

### C.

▉ The appellee, having admitted that Jamie was injured by Janie Sue, and this Court's having determined that the issues of provocation and lawful presence on the Hammons' property require jury determination, we now turn to the fourth and last element necessary for recovery under 4 O.S.1981 § 42.1—ownership.

### D.

Neither the statute nor case law give direction as to how narrowly or broadly the term "owner" should be defined. There is, however, some feeling on the part of the public generally that one who chooses to harbor a dog should be responsible for unprovoked attacks of the animal.[22] Moreover, one who treats a dog as living at his/her home and undertakes to control the dog's actions, may be considered to be the owner within the meaning of the law.[23] In *Whitefield v. Stewart,* 577 P.2d 1295, 1299 (Okla.1978), this Court recognized the public's concern and extended the version of § 42.1[24] then in effect to a person choosing to harbor a monkey with the proviso that the statute would also apply to the owner of a dog. The Court did not discuss whether a person harboring the monkey, but without a legal right to its possession, would also be an owner for purposes of the dog bite statute.

The appellee contends that there can be no recovery under § 42.1 because the appellant did not show legal ownership of the dog by Mr. Hammons. We might agree were we dealing only with the state statute. We are not. We must also consider the Tulsa Municipal Ordinance, Title 2, Ch. 1, § 1(d).[25] The definition of an owner within the meaning of this ordinance is broader than the one found in 4 O.S.1981 § 42.1[26] appears to be and includes the owner and "every other person having the care or custody of or harboring, keeping or maintaining any dog, cat, animal or domestic animal as herein defined ...".[27] It is undisputed that Mr. Hammons meets this broader definition of ownership. Therefore, we must determine what effect, if any, the municipal ordinance has on recovery under the state statute.

Tulsa, like any city operating under a charter form of government, may utilize its police power to adopt ordinances necessary for the preservation of its citizens' health,

---

**20.** *Hood v. Hagler,* see note 22, supra at 552.

**21.** *Ramage Mining Co. v. Thomas,* 172 Okl. 24, 44 P.2d 19, 23 (1935); *Dewitt v. Johnson,* 170 Okl. 625, 41 P.2d 476, 480 (1935); *City of Shawnee v. Cheek,* 41 Okl. 227, 137 P. 724, 732 (1913).

**22.** Pataki, "Torts: Animal Bites," 3 Okla.City U.L.Rev. 405–06 (1978).

**23.** *Buffington v. Nicholson,* 78 Cal.2d 37, 177 P.2d 51, 53 (Cal.Dist.Ct.App.1947). See also, *Hunt v. Hazen,* 197 Or. 637, 254 P.2d 210, 213 (1953); *Wood v. Campbell,* 285 S.D. 197, 132 N.W. 785 (1911).

**24.** Title 4 O.S.1971 § 42.1 is substantially the same as the current version and provides:

"The owner or owners of any dog which shall, without provocation, bite or injure any person while such person is in or on a public place, or lawfully in or upon the private property of the owner or owners of such dog, shall be liable for damages to any person bitten or injured by such dog to the full amount of the injury sustained."

**25.** Tulsa, Okla.Rev.Ord., Title 2, Ch. 1, § (1)(d) (1973), see note 2, supra.

**26.** Title 4 O.S.1981 § 42.1, see note 28, supra.

**27.** Tulsa, Okla.Rev.Ord., Title 2, Ch. 1 § (1)(d) (1973), see note 4, supra.

safety, morals and general welfare.[28] When both the Legislature and a home rule municipality have passed regulations in the same area, the test the municipal ordinance must survive in order to supersede the statute depends upon whether the power being exercised is purely municipal, or whether there is a wider public interest involved.[29] Matters found to be of local concern in Oklahoma include: removal of a municipal judge,[30] off-street parking,[31] recall elections of municipal officers,[32] widening of a state highway within city limits,[33] and the form of city government a municipality adopts.[34] Only when the local ordinance and state statute contain express or implied conditions inconsistent and irreconcilable with one another will they be characterized as conflicting.[35] Although regulation of dogs within a home rule city's limits might be a matter of local concern which would supersede a conflicting state statute, that determination is unnecessary here. The municipal ordinance's definition of ownership found in subsection (1)(d) and § 42.1's definition are neither inconsistent nor irreconcible. Even if the state statute only encompasses legal ownership, the Tulsa ordinance includes the whole of that definition and merely expands it to include

persons who harbor or exercise control over a dog. Where potentially conflicting legislation may be construed in such a way as to give effect to both and do violence to neither, that construction will be adopted rather than one leading to a conclusion that the two are at odds.[36]

There are some matters which are of concern to both the city and state and not the exclusive concern of either.[37] When this is the case, the two provisions governing the matter are cumulative and each is operative.[38] We find that matters concerning dog attacks is one area of concurrent local and state concern, and that where such ordinances exist and are not irreconcilable with the state statute, they are to be construed cumulatively with 4 O.S.1981 § 42.1. When this is done, the definition of "owner" found within Tulsa Municipal Ordinance, Title 2, Ch. 1, § 2(d) operates to extend the definition to include a person who harbors or maintains a dog. With that exception, the remaining elements necessary for liability under the state statute remain unaffected.

Under the controlling construction, Mr. Hammons is an owner as a matter of law; and it is undisputed that Jamie was bitten

**28.** *Moore v. City of Tulsa,* 561 P.2d 961, 963 (Okla.1977); *Jack's Supper Club, Ltd. v. City of Moore,* 361 P.2d 291, 294 (Okla.1961); *Sparger v. Harris,* 191 Okl. 583, 131 P.2d 1011, 1031 (1943); *Swanson v. City of Tulsa,* 633 P.2d 1256–57 (Okla.Crim.App.1981); *Ex Parte Gammel,* 89 Okl.Cr. 400, 208 P.2d 961, 965 (1949); See also, Okla. Const. art. 18, § 3(a) providing in pertinent part:
 "... Upon such approval (by the Governor) it (the city charter) shall become the organic law of such city and supersede any existing charter and all amendments thereof and all ordinances inconsistent with it...."

**29.** *Reed v. City of Tulsa,* 569 P.2d 451, 453 (Okla. 1977); *City of Wewoka v. Rodman,* 172 Okl. 630, 46 P.2d 334–36 (1935). See also, *Farmer v. City of Sapulpa,* 645 P.2d 518, 520 (Okla.1982); *City of Ponca City v. Edwards,* 460 P.2d 418, 421 (Okla.1969); *Lee v. Bishop,* 447 P.2d 1015, 1017–18 (Okla.1968); *Town of Luther v. State,* 425 P.2d 986, 991 (Okla.1967); *Sublett v. City of Tulsa,* 405 P.2d 185, 200 (Okla.1965); *State v. Linn,* 49 Okl. 526, 153 P. 826–27 (1915).

**30.** *Lee v. Norick,* 447 P.2d 1015, 1019 (Okla. 1968).

**31.** *City of Ponca City v. Edwards,* see note 33, supra.

**32.** *Moorehead v. Dyer,* 518 P.2d 1105, 1107–08 (Okla.1974).

**33.** *Moore Funeral Homes, Inc. v. City of Tulsa,* 552 P.2d 702, 704 (Okla.1976).

**34.** *Farmer v. City of Sapulpa,* see note 33, supra.

**35.** *Oklahoma Publishing Co. v. City of Moore,* 682 P.2d 754, 756 (Okla.1984); *Moore v. City of Tulsa,* see note 32, supra. See also, *Cent. Ambulance Service v. City of Tulsa,* 716 P.2d 705–06 (Okla.Crim.App.1986).

**36.** *Grand River Dam Auth. v. State,* 645 P.2d 1011, 1019 (Okla.1982); *Thornton v. Woodson,* 570 P.2d 340–42 (Okla.1977); *AMF Tubescope Co. v. Hatchell,* 547 P.2d 374, 379–80 (Okla. 1976); *In re Guardianship of Campbell,* 450 P.2d 203, 205 (Okla.1966).

**37.** *Moorehead v. Dyer,* see note 36, supra; *Lee v. Norick,* see note 34, supra.

**38.** *Moorehead v. Dyer,* see note 36, supra; *Burns v. Linn,* 49 Okl. 566, 153 P. 826, 828 (1915).

by the dog, Janie Sue. Therefore, in order to recover under the state statute, Jamie must show the remaining two elements—lack of provocation and lawful presence on the Hammons' property. Because we have previously determined that sufficient evidence was presented to create questions for jury resolution on these elements, the sustension of the appellee's demurrer was error insofar as it related to recovery under the dog bite statute, 4 O.S.1981 § 42.1.

## IV

## SUFFICIENT EVIDENCE WAS PRODUCED TO REQUIRE JURY RESOLUTION ON THE ISSUE OF COMMON LAW NEGLIGENCE

The next issue before us is whether the trial court was correct in sustaining the appellee's demurrer on the issue of common law negligence—that is, refusing to submit the question of liability to the jury based upon the defendant's knowingly harboring animals of a vicious propensity. We again find this Court's ruling in *Hood v. Hagler* instructive. In *Hood*, evidence consisting of the dogs' breed and size, the dogs' barking at passersby, the fact that they were kept for protection and trained as guard dogs along with evidence of a subsequent "bite" by one of the dogs, taken together, justified submission of the case to the jury on the basis of common law negligence.

■■■ The appellant in the present case presented the following evidence at trial: The defendant's dog was a pit bulldog, a breed specifically bred for its vicious propensities and stamina as a fighting animal. Although the defendant contended that the dog was kept purely as a pet, the dog was exposed to training tactics by its breeder and was chained in such a way as to keep it in an anxious and aggravated state. Some months after the incident where Jamie was mauled, the same dog jumped through a screen door and chased Jamie across the street into a neighbor's home. None of these facts taken alone might justify submission of the issue of scienter to the jury, but the combination of these facts,[39] like those found in *Hood*, does necessitate submission to the jury. The appellee's contention that Jamie's contributory negligence is a defense for the action of common law negligence appears meritless. Jamie was approximately five and one-half years old at the time of the attack. A child of tender years is generally considered incapable of contributory negligence.[40] Therefore, we find that the trial court committed reversible error in denying the appellant a jury determination on the issue of common law negligence.

## V

## THE DOCTRINE OF ATTRACTIVE NUISANCE IS INAPPLICABLE TO THE PRESENT FACTS

■■■ While the doctrine of attractive nuisance is recognized in Oklahoma, application of the doctrine requires a balancing of societal interest in the safety of children against private interest.[41] Under the doctrine, a land owner is duty bound "... to make reasonably safe any obviously dangerous, artificial, and attractive condition on his premises, which in character is clearly different from common and well-known dangerous natural conditions ...".[42]

The dog, Janie Sue, was neither Jamie's reason for crossing the fence nor is a dog an artificial condition. The majority rule is that ordinary domestic creatures cannot constitute attractive nuisances because they are too common to be considered inherently dangerous even to a child.[43] Because Jamie did not enter the Hammons' property because of any attraction to the animal and because this particular dog was

39. *Hood v. Hagler*, see note 22, supra at 553.

40. *Connor v. Houtman*, 350 P.2d 311, 313 (Okla. 1969).

41. *J.C. Penney Co. v. Clark*, 366 P.2d 637, 639 (Okla.1961).

42. *City of Shawnee v. Clark*, 41 Okl. 227, 137 P. 724, 732 (1913).

43. Annot., "Animals as Attractive Nuisance," 64 A.L.R.3d 1069–70 (1975). See also, *Dykes v. Alexander*, 411 S.W.2d 47, 49 (Ky.1967).

not so unusual as to arouse any special curiosity in children, we refuse to extend the doctrine of attractive nuisance. The trial court was correct in sustaining the appellee's demurrer to the evidence insofar as it related to recovery under the doctrine of attractive nuisance. However, because there were material questions of fact, the trial court erred in sustaining the demurrer to the evidence—the cause should have been submitted to the jury.

OPINION OF THE COURT OF APPEALS VACATED; JUDGMENT OF THE TRIAL COURT AFFIRMED IN PART, REVERSED IN PART; REMANDED WITH DIRECTIONS.

DOOLIN, C.J., and HODGES, ALMA WILSON and SUMMERS, JJ., concur;

SIMMS, J., concurs in judgment;

OPALA, J., concurs in part, dissents in part;

HARGRAVE, V.C.J., and LAVENDER, J., dissent.